173 So.2d 238 (1965)
NATIONAL MOTOR CLUB OF LOUISIANA, INC., Plaintiff-Respondent,
v.
Louis J. CONQUE, Defendant-Relator.
No. 1379.
Court of Appeal of Louisiana, Third Circuit.
March 24, 1965.
Rehearing Denied April 14, 1965.
*239 Carmouche & Shelton, by Emile A. Carmouche, Crowley, for defendant-relator.
Domengeaux & Wright, by Bob F. Wright, Lafayette, for plaintiff-respondent.
EN BANC.
TATE, Judge.
The plaintiff employer ("National Motor") seeks to enforce a contract whereby defendant Conque, its former employee, agreed that upon the termination of his employment as district manager he would not compete with the employer's business. After a trial on the merits the district judge granted a permanent injunction prohibiting competition for a period of two years. On application of defendant Conque, we granted a writ of certiorari.
The sole question before us is whether the noncompetitive agreement in question is authorized under a 1962 amendment to LSA-R.S. 23:921. (The statute with the amendment is set forth in full as Appendix A to this opinion.) By its basic provision, this statute prohibits an employer from securing an agreement from any of his employees not to engage in a competing business upon the termination of his employment. The 1962 amendment provides a limited exception for noncompetitive agreements of limited duration and area, "where an employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in."
The trial court held that the present noncompetitive agreement was justified because the employer produced proof of what it claimed to be training and advertising expenses. By his appeal, the employee defendant contends that these expenses were not of a nature so as to justify a valid noncompetitive agreement as authorized by the 1962 proviso. This contention is the principal issue of this appeal.
The facts show that plaintiff, National Motor Club, is engaged in the business of selling memberships to automobile owners, each member receiving a policy for a premium of $20-25 which insures the policy-holder according to a limited schedule against accidental loss to him or for hospital expenses resulting from the use of his automobile during the policy year. For the operation of this business, plaintiff employed a state manager and a number of district managers, each district comprising a certain number of parishes. The district managers were responsible for recruiting and supervising salesmen. The defendant Conque had been employed by National Motor since 1960 as a salesman and since 1962 as a district manager of a 12-parish district in southwest Louisiana.
The defendant Conque is a 42-year-old man who has lived and worked in southwest Louisiana during his entire lifetime. Prior to entering the service of National Motor Club, he had worked as a buyer and shipper in the sweet potato business for eleven years, as well as a salesman in the television business. His earnings as salesman and manager with National Motor Club grossed about $40,000 annually, with a net annual income of from ten to fifteen thousand dollars.
*240 Partly because of a disagreement with his employer over what he felt to be a reduction or non-enlargement of his sales territory, Conque resigned from the plaintiff's employment on August 14, 1964. Immediately, he entered into competition with National Motor Club in the same southwest Louisiana area as a part-owner and employee of a similar firm, the American Motor Club, which included the contacting and selling of memberships in American to customers of National, his former employer.
Under the terms of the injunction granted at the instance of National Motor Club, Conque is enjoined "from engaging in the selling, soliciting, writing, or otherwise dealing with automobile insurance associations which sell memberships or policies of insurance for bodily injury, death and/or allied coverage" for a period of two years from the date his employment terminated.
By the terms of the injunction, thus, the defendant employee is enjoined from earning a livelihood in the field of his experience, not only in the area of southwest Louisiana in which he has lived during his entire life, but elsewhere as well. Certiorari was issued by us primarily because of the obviously too broad restrictions of the injunction. However, upon consideration of the entire record, we have concluded that the injunction should be denied, not merely limited.
The record shows that there are numerous other "automobile clubs" competing with the present plaintiff National Motor Club. In order to prevent its employees from joining other companies or going into business for themselves, National Motor Club has exacted from each of its salesmen and district managers an agreement not to compete with it after they leave its employment "for any reason whatsoever, either by his own [the employee's] efforts or by the Company's efforts with or without just cause." The term of the noncompetitive agreement was for five years within the State of Louisiana.[1]
The plaintiff company claims that such an agreement is validated by 1962 legislation. However, this court has concluded that the present agreement is not within the authorization of limited exceptions permitted by the 1962 amendment, and that the agreement is totally invalid as contrary to statute and to the public policy of Louisiana.
The basic provision of LSA-R.S. 23:921, incorporating the public policy of this state, flatly provides: "No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court * * *." The 1962 amendment to be discussed below, permits a limited exception to this broad policy.
Even prior to the enactment by Act 33 of 1934 of this prohibition against exaction of noncompetitive agreements from employees, they were consistently held to be unenforceable. Cloverland Dairy Products v. Grace, 180 La. 694, 157 So. 393 (1943); Blanchard v. Hager, 166 La. 1014, 118 So. 117 (1928). See 27 Tul.L.Rev. 364 (1953). (In most states other than Louisiana, however, noncompetitive contracts are recognized if reasonably restricted as to time and area. See Annotations *241 at 41 A.L.R.2d 15 and 43 A.L.R.2d 94.) In the absence of an enforceable contract to other effect, an employee has the absolute right to actively serve a business competing with his former employer after leaving the latter's service, Jones v. Ernest & Ernest, 172 La. 406, 134 So. 375 (1931); as, for instance, does a former officer who actively competes with his former corporate principal, Marine Forwarding & Shipping Co. v. Barone, La.App. Orl., 154 So.2d 528 (1963).
As noted in these decisions, their essential basis is the right of individual freedom and of individuals to better themselves in our free-enterprise society, where liberty of the individual is guaranteed. A strong public policy reason likewise for holding unenforceable an agreement exacted by an employer of an employee not to compete after the latter leaves his employment, is the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away his liberty to earn his livelihood in the field of his experience except by continuing in the employment of his present employer.
These fundamental principles must be borne in mind in interpreting and applying to the present facts the 1962 amendment providing a limited exception to the above-quoted basic provision of LSA-R.S. 23:921, that noncompetitive agreements exacted of employees "shall be null and unenforceable in any court."
The 1962 amendment did not repeal the broad statutory provision that noncompetitive agreements exacted from an employee were null and unenforceable. See Appendix A. The amendment simply added a proviso excepting those noncompetitive agreements of limited territory and duration "in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in." In view of the retention of the broad provision for the unenforceability of such noncompetitive agreements and in the context of the prior jurisprudence, the apparent purpose of the 1962 amendment is to protect an employer only where he has invested substantial sums in special training of the employee or in advertising the employee's connection with his business.
We do not think noncompetitive agreements such as the present can be justified as valid on the naked ground that the employer spends sums advertising the business itself (as distinguished from advertising the employee's connection with it), for almost every business this dayevery department store, every service station, even corner grocery storesspends money advertising its products and services. That is, for example, the Ford Motor Company could not validly require that its factory employees enter into noncompetitive agreements simply because Ford spends large sums advertising its product. To hold these general advertising expenses justified a noncompetitive agreement binding an employee, it seems to us, would make meaningless the broad and basic statutory prohibition against such agreements with only limited exceptions.
Likewise, we do not think that normal expenses of administration and supervision can be used to justify these noncompetitive agreements, on the guise that such are "training" expenses. If they are, then few if any employees could not be required to tie themselves down to their present employer by the exaction of noncompetitive agreements. What the legislators must have intended, it seems to us (since they did not repeal the basic prohibition against such contracts as void as against the public policy of this state), was to protect the investment of those employers who afford special training of a substantial nature to their employees, and to encourage them to do so.
In the present case, the employee Conque was employed as a salesman by National *242 Motor Club in May of 1960. Virtually all of the nominal so-called training expenses were incurred some three or four months after this initial employment in 1960. On October 9, 1962, the defendant Conque was promoted to district manager of a district including some twelve parishes of Southwest Louisiana.
Not until February 6, 1963, was the present contract signed, exacting from the defendant Conque (already employed as district manager on the same terms), an agreement not to engage in the same business as National Motor Club after the termination of his employment as manager with this company. The consideration furnished to Conque for the execution of this agreement was not any past or future training expenses; it was simply to employ him for at least thirty more days in the position he had already held for four months, and to continue to pay him the same 5% override of commissions earned by salesmen working with him which had constituted his compensation as manager from the time of his first employment as manager.
In attempting to prove advertising expenses incurred by it, the plaintiff produced proof of approximately $500 spent over four years for giveaway emery boards and travel kits, sponsoring a bowling team, complimentary advertisements in Shrine and Knights of Columbus programs, etc. Not only were most of these expenses incurred prior to execution of the 1963 employment contract with Conque as manager[2]; but the evidence is devoid of proof that these advertisements did other than advertise National Motor Club itself, as distinguished for instance from advertising the defendant Conque as the man to see about automobile club insurance.
Likewise, although the plaintiff attempted to claim that override commissions paid its managers for working with Conque and other employees were "training" expenses, Conque's contract itself and the other evidence indicate that the compensation of managerial employees was fixed by a 5% override on the commissions of all sub-employees working in their territory. Not only were the bulk of these so-called training expenses incurred back in 1960 before Conque ever became manager, and not only did the plaintiff fail to produce any testimony from the managerial employees themselves that they received additional compensation for training Conque (which Conque denied); but the plaintiff's executive vice president, who testified to the penny from company records as to the so-called "advertising" expenses, failed to produce proof of any specific amount or of any particular day's work upon which managerial employees were paid additional compensation for expenses of training Conque. The executive vice president's generalized statement that training expenses were incurred is most unimpressive in view of the failure of the plaintiff company to produce proof from its records (so detailed on other matters) of any specific training expenses incurred on behalf of Conque.
The only other so-called "training" expenses relied upon were the reimbursement of the defendant's nominal expenses in attending meetings of the company district managers at Dallas ($59.85 on 7/16/63; $107 on 4/21/64, which latter included reimbursement of the expenses of three other couples also; and $49.40 on 7/14/64), or sales clinics sponsored for managers and salesmen in New Orleans ($31.40 on 3/19/63; $23.84 on 8/11/64). These meetings *243 did not represent specialized training but rather were the normal administrative meetings held of sales organizations to spur the salesmen on to greater sales, to explain policy interpretations, etc. The nominal amounts expended on this normal administrative feature of sales forces cannot, in our opinion, be the sort of employer investment for training which the legislature intended to permit protection of by noncompetitive agreements validated under the 1962 amendment.
In summary, the type of expenses claimed herein to constitute training and advertising costs were simply the normal costs of administration and advertising incurred by any business. The bulk of these nominal expenditures were made in 1960 and 1962, before Conque ever became manager and long before he entered into the present non-competitive agreement, and before the 1962 legislation legitimized some limited types of noncompetitive agreements.
We cannot hold that these normal costs of running a business are the sort of training and advertising expenses which validate noncompetitive agreements under the 1962 amendment, invalid otherwise under the basic provisions of LSA-R.S. 23:921 and under the public policy of Louisiana. If we do so, then in effect the basic provisions of the statute have been judicially repealed, for then all noncompetitive agreements exacted from employees may be held valid, whether or not the employer has incurred any special expenses in training the employee or advertising the employee's connection with the employer's businessthe special circumstances alone intended by the 1962 amendment as validating such noncompetitive agreements (and then only if entered into for a statutorily-limited duration and applying only to a statutorily-limited area[3]).
The decision we have reached herein is to some extent conflicting with Aetna Finance Company v. Adams, 170 So.2d 740, recently decided by our brothers of the First Circuit. The features of that case which may distinguish it somewhat from the present are that more substantial sums were spent on advertising and that the agreement itself attempted to comply with the duration and territorial requirements of the 1962 amendment (see Footnote 3 above); but essentially in that case the court decided that general administrative and advertising expenses sufficed under the 1962 amendment to validate a noncompetitive agreement obtained from an employee. For the reasons noted earlier, we disagree.
The noncompetitive agreement also included a clause whereby the employee and the company had expressly agreed that the employee could not attempt to sell competing memberships to the company's customers after his employment terminated. The trial court expressly enjoined the defendant Conque from using a list of National Motor Club's members and expiration dates which he had compiled as manager.
Initially, we thought that the plaintiff company was entitled to this protection under the holding of Martin-Parry Corp. v. New Orleans Fire Detection Service, 221 La. 677, 60 So.2d 83. In that decision, an employer secured injunctive protection of *244 an agreement confected with a former employee-manager during his employment, in which the manager had agreed not to "persuade any employee or dealer of the Company to discontinue his relation to the Company as an employee or dealer, as the case may be." 60 So.2d 84. The court held that this agreement was supported by valuable consideration (the salary paid the employee) and was enforceable, since "as long as the object of the contract is lawful, it is the duty of the court to enforce it as written." 60 So.2d 84.
However, further thought has convinced us that the object of the present agreement is not "lawful", unless supported by valid training and advertising expenses. By LSA-R.S. 23:921, the legislature has forbidden, with exceptions we have held not here applicable, that no employer may require "any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another." The essence of the automobile club business is the selling of memberships to friends, acquaintances, and the general public. To require an employee to limit his activities in this regard after he ceases his employment, is to require him not to engage in a competing business, in violation of the statutory prohibition.
The Martin-Parry case involved protection of an agreement not to raid the employer's staff and dealerships. The court apparently considered this a different type of activity than engaging in a competing business by seeking customers in competition with the former employer, for it expressly noted that noncompeting agreements extracted from employees were "vastly different in nature" from the Martin-Parry agreement and are "violative of public policy." 60 So.2d 85.
The evidence shows that the defendant Conque knows from memory most of the former customers of his district. An attempt to enjoin him from using the list he compiled as manager would be unenforceable, since we deem the noncompetitive agreement void insofar as it sought to prevent Conque from contacting National Motor Club's customers (i.e., in the absence of the list) after termination of his employment. While perhaps the plaintiff is entitled to the return of the list, that demand is not before us by any appeal or appellate pleadings in this court.
Accordingly, the judgment below is reversed insofar as it enjoined the defendant Conque from engaging in competition with the business of the plaintiff or from contacting the present or former customers of this firm. The plaintiff's suit is dismissed insofar as its demands relate to securing an injunction to such effect. (Other issues of the case are not before us.) The plaintiff is to pay all costs of the proceedings below and of this court.
Reversed in part.
HOOD, J., dissents and assigns written reasons.
SAVOY, J., dissents for the reasons assigned by HOOD, J.

Appendix "A"
LSA-R.S. 23:921 (as amended by Act 104 of 1962):
"No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years." [The italicized proviso was added by the 1962 amendment.]
*245 HOOD, Judge (dissenting).
I am unable to agree with the conclusions reached by the majority in this case.
LSA-R.S. 23:921, as amended by Act 104 of 1962, provides:
"No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years."

The proviso which constitutes the last part of this section of the Revised Statutes was added by the 1962 amendment. In enacting that amendment, I think the Legislature intended to authorize exactly the type of contract which is at issue in this suit, and it intended for such a contract to be valid and enforceable under the circumstances presented here.
The majority has held that a bilateral commutative contract under which the employee agrees not to engage in a competing business on the termination of the employment is not valid unless the employer has "invested substantial sums" in the training of the employee or in advertising the business. I do not believe such an interpretation of LSA-R.S. 23:921 is justified. The statute provides that that type of contract is valid if the employer "incurs an expense" for training or advertisement. I would agree that such a contract may be invalid if the expense incurred by the employer for training or advertisement is so insignificant as to constitute no expense at all. But in this case, and as shown in the majority opinion itself, more than negligible sums of money have been spent by the employer in training the defendant and in advertising the business.
Prior to May 16, 1960, when Conque was first employed by plaintiff, he had had no experience or training whatever as an insurance salesman. The district manager, Mr. Dorsey, gave Conque a sales kit and then periodically worked with him in the field selling memberships. There is some dispute as to how many days were thus spent by Dorsey in training Conque. The then state manager, Mr. Crumpler, testified that Dorsey spent many months helping to train Conque, while the defendant testified that Mr. Dorsey spent only 20 full days with him during the period of about one and one-half years that he was a sales representative. In any event, I think the evidence is clear that on those days when Mr. Dorsey went with Conque to sell memberships, Mr. Dorsey was paid by the National Motor Club of Louisiana, Inc., an overriding commission of 5% on all sales made on such training days. This commission paid to Dorsey was in addition to the regular sales commission paid to Conque. The record does not show the exact amount of these extra commissions paid to Mr. Dorsey as a training expense for Mr. Conque, but Conque admits that Dorsey spent at least 20 days with him in the field, and Mr. Crumpler testified that the training commissions were paid to Mr. Dorsey. Even if these high company officials had not received any more than their regular wages or commissions, the fact that they devoted their full time for a number of days to the training of Conque should be regarded *246 as the incurring of expense by the employer in training the employee.
In addition, four different state managers spent one or two days each in the field with plaintiff and were paid the 5% training commissions. Mr. Crumpler worked with defendant at least one full day, Mr. O'Conner, one day, Mr. Jerry Noe, one day, and Mr. Phil Burgess, two days.
Defendant attended at least ten sales clinics in New Orleans, for which his expenses were paid by plaintiff. He argues this was not a training expense but was no more than an ordinary business expense such as any sales organization incurs for sales promotion. Conque, however, used substantially the same types of sales clinics for the salesmen who worked under him, and he regarded these clinics as "training" programs. I think the expenses incurred by plaintiff for these clinics must be regarded as training expenses.
The majority also has held that a non-competitive contract such as the one at issue here is not valid unless the employer has invested substantial sums "in advertising the employee's connection with his business." I can find no logical basis for such a holding. The statute provides that such a contract is valid if the employer "incurs an expense in the advertisement of the business that the employer is engaged in." I think this means exactly what it says, and not the entirely different provision which the majority has read into the statute. As shown by the majority opinion itself, the employer has incurred an expense (a substantial expense, I think) in advertising the business in which it is engaged, and that is all that is required in order for the contract to be valid under the statute. Actually, I think some of the advertising expense must be regarded as having been incurred to advertise Conque's connection with the business. For instance, the company paid for an advertisement relating to the Shrine circus, in which advertisement Conque's name was shown. Also, the emery boards, pocket savers, travel kits and fountain pens, which were provided at least partially by the company for advertising purposes, were distributed by Conque himself, and it seems to me that that constituted a direct advertisement not only of the business but also of Conque's connection with it.
As noted by the majority, the opinion being rendered in the instant suit is in direct conflict with the recent case of Aetna Finance Company v. Adams, La.App. 1 Cir., 170 So.2d 740 (cert. denied). Our Supreme Court, 172 So.2d 294 refused writs in that case, assigning as reasons therefor that "On the facts found by the Court of Appeal, there is no error of law in its judgment." In that case our brothers of the First Circuit appropriately observed:
"We are asked to set aside the contract insofar as the provisions of competing are concerned as being contrary to the public policy but where, as here, the legislature has itself spoken in clear and unambiguous language, the Court properly will not substitute its opinion of public policy for that which has been specifically expressed by the legislature."
The facts in the instant suit, I think, are even more favorable to the plaintiff than were the facts in the Aetna Finance Company case. And, in my opinion, the majority clearly has erred in rejecting that decision.
For the reasons assigned, I respectfully dissent.
On Application for Rehearing.
En Banc. Rehearing denied.
HOOD and SAVOY, JJ., are of the opinion that a rehearing should be granted.
NOTES
[1] "The Manager agrees that upon the termination of his services with the Company for any reason whatsoever, either by his own efforts or by Company's efforts, with or without just cause, not to engage in the business of owning, operating, establishing, maintaining, working in, financing, being a director, stockholder or consultant or in or by any other capacity or means engage in the business of operating a motor club or other similar type of touring service or operation in any way competitive to that of the Company for a period of five years from date of this agreement in the State of Louisiana."
[2] The only advertising expenses incured in 1963-1964 while plaintiff was manager seem to be: $35.00, Shrine Club program; $20.00, sponsoring Knights of Columbus bowling team; $10.00, advertisement in Knights of Columbus rodeo program; $10.48, refills for National Motor Club ballpoint pens; $67.32, giveaway emery boards to advertise National Motor Club. (We fail to see the relevance, for instance, of proof that National Motor Club spent $252, which is about half of all advertising expenditures claimed, for giveaway emery boards on March 8, 1962, before the plaintiff was ever manager.) These advertising expenses are summarized at pp. 77-81 Note of Evidence.
[3] We do not reach and expressly do not pass upon a contention that the present noncompetitive agreement, intended to restrict competition for a duration of five years and throughout the entire State of Louisiana, may be totally instead of partially unenforceable under the very terms of the 1962 amendment, which authorized such agreements as limited only to a duration of two years and as applying only to the same route or territory in which the employee had worked (in this case, some twelve parishes of Louisiana, instead of the entire state specified by the agreement). See: 17 C.J.S. Contracts § 289 at p. 1224 and § 254, p. 1135; Annotation, Enforceability of restrictive covenant, ancillary to employment contract, as affected by territorial extent of restriction, 43 A.L.R.2d 94; Annotation, Enforceability of restrictive covenant, ancillary to employment contract, as affected by duration of restriction, 41 A.L. R.2d 15.