341 So.2d 600 (1977)
TARGET RENTAL TOWEL, INC., Plaintiff-Appellant,
v.
Johnny A. BYRD, Defendant-Appellee.
No. 13106.
Court of Appeal of Louisiana, Second Circuit.
January 10, 1977.
*601 Love, Rigby, Dehan & Love by Truly W. McDaniel, Shreveport, for plaintiff-appellant.
J. Stacey Freeman, Shreveport, for defendant-appellee.
Before BOLIN, PRICE and MARVIN, JJ.
MARVIN, Judge.
Plaintiff corporation (Target) appeals from a judgment rejecting in most part its demands to enjoin Defendant Byrd, a shareholder and former employee, from competing with Target in the business of renting towels to industrial and commercial users.
Two written agreements not to compete were signed by Byrd on December 13, 1971. One agreement (styled "Covenant Not to Compete") was between Byrd and Rodney L. Stevens, as shareholders of Target.[1] The *602 other was between Byrd, as employee, and Target, as employer. Stevens signed this agreement for Target.[2]
Target generally contends that Byrd, as a shareholder in Target, and as a partner with Stevens in a "partnership" as shareholders in Target, is not an "employee" within the meaning of R.S. 23:921 which would preclude enforcement of non-competition agreements unless the employer incurs an expense in training the employee or advertising the employee's connection with the business.[3]
The lower court held Byrd to have been an employee of Target and that Target had not spent a sufficient amount of money in training or advertising Byrd so as to come within the proviso of R.S. 23:921.
*603 The record fully supports the trial court's judgment and we affirm.
Where a person sells a going business to a purchaser and remains an employee of the business after the sale, an agreement not to compete may be enforced against that person, should he terminate the employment and engage in competition. Gold & Suckle, Inc. v. Suckle, et al, 335 So.2d 713 (La.App.2d Cir. 1976). Liquidated damage provisions have also been upheld because of violation of a non-competition agreement executed between partners upon creation of a true professional partnership. McCray v. Cole, 236 So.2d 863 (La.App.3d Cir. 1970).
As to those in employee-employer status, the controlling case is Orkin Exterminating Company v. Foti, 302 So.2d 593 (La.1974). There the Supreme Court granted certiorari to "resolve a conflict in the intermediate court decisions interpreting the legality of agreements . . . not to compete." As the Supreme Court there noted and held, the basic public policy of Louisiana disfavors non-competition agreements exacted of employees. The 1962 amendment to R.S. 23:921, providing that such agreements could be enforced where the employee incurs expense in training or advertising the employee, was there held not to repeal the basic public policy. The Supreme Court said:
"In view of the fundamental policy of the basic statute, the apparent purpose of the 1962 amendment, . . .`is to protect an employer only where he has invested substantial sums in special training of the employee or in advertising the employee's connection with his business.'" 302 So.2d 593, 597.
The court had earlier stated:
"We resolve the conflict [between the intermediate appellate courts] by approving National Motor Club v. Conque [173 So.2d 238 (La.App.3d Cir. 1965)] and its progeny. Aetna Finance v. Adams [170 So.2d 740 (La.App.1st Cir. 1964)] and those decisions which follow its rationale or reach its result are overruled." 302 So.2d 593, 596.
Delta Finance Company of Louisiana v. Graves, 180 So.2d 85 (La.App.2d 1965) is more analogous to the rationale of Aetna Finance Co. v. Adams, supra, than as to National Motor Club v. Conque, supra. Indeed the trial court there relied on National Motor Club. We distinguished National Motor Club and reversed the trial court, citing the fact that National Motor Club conflicted with Aetna Finance Co. We do not find the Delta Finance Company case authoritative here for the reasons expressed in the Orkin Exterminating Company case by our Supreme Court in 1974.
The basic public policy of Louisiana disfavors the enforceability of agreements not to compete exacted from employees by employers. Only in instances where the employer has invested substantial sums in special training of the employee or in advertising the employee's connection with the business, will the proviso of R.S. 23:921 be recognized and then to the limited extent therein provided.
The record reveals that Byrd was working for a competitor, American Dust Control, before he began working for Target in December, 1971. Byrd was solicited by Stevens to come to work as manager for Target, which was newly incorporated. Target's predecessor and associated company was Target Wiping Cloth Company, owned by Raymond Stice. The wiping cloth company owned the facilities out of which Target operated, provided office space and cleaned and recleaned towels with which Target serviced its customers. Target paid the wiping cloth company for these services and facilities. Byrd owned no interest in the wiping cloth company.
Byrd's duties were establishing, as well as servicing, routes among customers who were solicited to use towels and products of Target. Byrd was promised ten percent of Target's shares as an inducement to come to work for Target. About one month after he began working, this agreement was written and executed between Byrd and all the officers and shareholders of Target:
"This Stock is issued in consideration for loyal and diligent service and the furnishing *604 to Target Rental Towel Incorporated covenants and work contracts. We agree to issue 5 Shares of Target Rental Towel Incorporated and 5 Shares at the end of 12 months for loyal employment to Johnny Byrd."
The agreement was consummated by the issuance of the shares to Byrd as contemplated.
In two or more transactions, Byrd thereafter bought from Stevens an additional 20 shares for cash. By December 3, 1975, Raymond Stice had died and Stevens was no longer a shareholder or employee of Target. On that date, David Stice (oldest son and heir of Raymond Stice) by corporate resolution, was authorized as secretary of Target, to cancel and reissue the stock of Target to reflect ownership by three persons of an equal number of shares. Byrd was given an additional three and one-third shares to equalize the ownership of the corporation, in a corporate resolution which stated in part:
"... That an additional 3 1/3 shares of Stock be issued to JOHNNY A. BYRD in addition to his thirty shares (30) for services rendered and to be rendered. . . and that the stock be [re]issued as follows:
 David L. Stice 33 1/3 Shares
 Jack Otis 33 1/3 Shares
 Johnny A. Byrd 33 1/3 Shares"
David Stice controlled two-thirds of Target's shares and controlled the wiping company whose facilities and services Target was using. Stice periodically caused to be increased the rental and service fees charged to Target.
Byrd assigned this as the reason he quit Target about May 2, 1976, and resumed working for American Dust Control. Two other Target employees followed or accompanied Byrd from Target to American. This instant litigation was instituted about two weeks later against Byrd.
While Byrd, as a shareholder and officer of Target, enjoyed certain executive functions, he was nonetheless an employee of the corporation. He was paid a salary and more than one-third of his own shares came to him for services performed as an employee of the corporation. Byrd also received some commissions from Target ($50 for each 1,000 in gross sales above $9,000 per month). He was paid nothing in dividends and his status in the corporation, even as a one-third minority shareholder, was subject to the desire of the corporate board of directors, which of course was controlled by the two-thirds majority shares. The right of control and direction in the conventional sense of the employment relation is one of the most important tests in determining whether one is an employee. Whether the right is exercised is of much lesser importance. Simpson v. Kelly Services, Inc., 339 So.2d 490 (La.App.2d Cir. 1976), Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483 (1955). We agree with the trial court that Byrd was an employee within the context of R.S. 23:921.
The record also establishes that Target paid approximately $25 for business cards for Byrd (about 1,000 cards) and approximately $75 for a newspaper advertisement(s) linking Byrd and Stevens with Target in January, 1972. Even should the entire cost of advertising be allocated to Byrd, the total amount shown to have been expended would be less than $25 per year for the 4.3 years Byrd was employed by Target. Target expended nothing training Byrd. This is not sufficient to bring Byrd within the proviso of section 921 as interpreted by the Supreme Court in Orkin Exterminating Company v. Foti, supra.
The "Covenant Not to Compete" (footnote one, supra) between Stevens and Byrd also does not avail Target. When it is viewed in context with the agreement with Target executed the same day (footnote two, supra), as it should be, it is nothing more than an attempt to circumvent R.S. 23:921. It is not a restriction on the transfer of the shares owned by Stevens or Byrd. R.S. 12:57(F). It is apparently contingent upon the employment by Target of Byrd and Stevens. In this respect, it states:
"If any party . . ., during the term of this contract [?] or for a period of five *605 years after the sale of the shares of stock. . . shall . . . engage [in competition] . . . then the other parties . . . or the corporation. . . shall be entitled [to injunctive relief] . . ." (Emphasis supplied).
Stevens is no longer connected with Target, as an employee or as a shareholder. Should the agreement be construed as enforceable between the shareholder-signatories (and we do not so hold), it is not enforceable by the corporation, when the circumstances under which it was executed are considered. Byrd did not participate in the creation of the corporation or induce others to invest in its venture. Byrd was the one induced by others to assume employment with Target and minority ownership of Target's shares in return for agreeing to work for the corporation. The circumstances of and consideration for Byrd's association with Target are not remotely similar to circumstances involving the sale or creation of a business where non-competition agreements have been enforced. See and compare Gold & Suckle, supra, and Mathieu v. Williams, 255 So.2d 151 (La.App.2d Cir. 1971).
At appellants' cost, judgment is
AFFIRMED.
NOTES
[1] ". . . That each party to this agreement is a shareholder in TARGET . . .

"That TARGET . . . is engaged in the business of towel rentals, [etc] . . .
"That all parties . . . in consideration of the mutual promises granted herein, do hereby covenant . . . that each party . . . will not, within a five year period commencing after the sale of the shares of stock in TARGET. . ., directly or indirectly engage in the business of towel rentals, dust control service (mops, walk-off mats, hand wipes), and uniform rentals, within a 100-mile radius of the city of Shreveport, . . . If any party to this agreement, during the term of this contract or for a period of five years after the sale of the shares of stock in TARGET . . . shall, in violation of this provision, engage in the business described herein, then the other parties to this agreement or the corporation . . . shall be entitled to an [injunction] injoining [sic] and restraining such person . . . from the continuance of such conduct of the business made subject of this agreement not to compete."
[2] WHEREAS, Employer desires to employ Employee, and Employer will expend its funds in training and publicizing Employee in the Towel Rental Business, Dust Control Service (mops, walk-off mats, hand wipes), and Uniform Rental Business, and incur an expense in the training and publicizing of Employee for the purposes stated herein; . . .

EMPLOYER AGREES to employ the above named Employee, and said Employee agrees to continue in the employment of Employer, subject to the additional provisions of the Contract. The consideration for the execution hereof is Ten Dollars ($10.00), and other good and valuable considerations, paid to Employee by Employer, the receipt of which is acknowledged by Employee.
* * * * * *
"This contract of employment may be terminated by either party, with or without cause and without notice, but upon such discontinuation of employment the additional provisions of this contract shall nevertheless remain in full force and effect.
"It is understood . . . that the . . . Employer's business requires that Employee. . . solicit business from the customers of said Employer, and thus create . . . a personal relationship between Employee and customers or potential customers of Employer. In addition, Employee will . . . learn and be trained to know Employer's methods of business as well as the customers or potential customers upon which said Employee will be required to call and visit with during the performance of the customary course of business, and because of the personal relationship thereby created between Employee and customers as well as potential customers of Employer, irreparable damage to Employer could and would result if the Employee should leave the Employer's employment and, within a reasonable time, engage in a business or operation or as an employee of some other business or operation in competition in any manner to that of the above named Employer within the area in which said Employer does business. The provisions of this particular paragraph have been explained to and are well understood by Employee prior to the execution of this contract. "In consideration of the aforementioned promises and in further consideration of the continued employment by Employer of Employee, the Employee agrees that he will not at any time, while he is in the employment of the above named Employer or within twenty-four (24) months after cessation of his employment with said Employer, . . . engage in the towel rental, dust control (mops, walk-off mats, hand wipes), or work uniform rental business, directly or indirectly competitive with the business of the above named Employer, in the same territory in which Employer is transacting business, which is a geographical area having a 100 mile radius from the City of Shreveport . . .
"In addition to the foregoing agreement, Employee further agrees and covenants that he will not, whether directly or indirectly, solicit, divert, service, attempt to take away or in any manner take away any of the customer business, potential customer business or patronage of the above named Employer during the specified period of time herein set forth and within the specified area herein set forth. In this connection, and before the execution hereof, Employee understands the specific area that he shall not compete with Employer and agrees to the terms and provisions thereof.
* * * * * *
 "TARGET RENTAL TOWEL, INC.
"BY: S/Rodney L. Stevens 
 EMPLOYER
" S/Johnny A. Byrd 
 EMPLOYEE"

[3] R.S. 23:921: "No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years."