**THEATRE TIME CLOCK, INC.**

v.

**William J. STEWART.**

**Civ. A. No. 67–849.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 29, 1967.

**594**

Tom Wyllie, James E. Blazek, New Orleans, La., for plaintiff.

Gibbons Burke, J. G. Burke, Jr., New Orleans, La., for defendant.

CHRISTENBERRY, Chief Judge.

Theatre Time Clock, Inc., a Pennsylvania corporation seeks to enjoin the defendant, William J. Stewart, a Louisiana citizen and former employee of the plaintiff from engaging, for a period of three years, in any competitive activity or business, in any capacity or from making use of knowledge and information obtained by him concerning the names, addresses and expiration dates of contracts that various individuals had with the plaintiff or from serving or in any way soliciting plaintiff's customers within the specified territory and in addition prays for damages against the defendant, William J. Stewart. Plaintiff further

requests that the defendant be required to return to plaintiff all copies of records pertaining to the plaintiff's business which he took including but not limited to customers' lists and inter-office memoranda.

## I.

## THE NATURE AND HISTORY OF MOTION PICTURE ADVERTISING

The following information concerning the nature and history of motion picture advertising is taken from a stipulation of the parties involved.

The business of motion picture advertising is not the business of advertising motion pictures. Shortly after the advent of the outdoor theatre or drive-in, those in the business discovered that because of the limited playing time, from dark until 11 to 12 P.M. a profitable operation required the exhibition of two regular length features. The operators soon learned that a large part of their gross income was derived from concessions, that is the sale of popcorn, candies, soft drinks and later hot and cold sandwiches and other food snacks. They therefore resorted to a policy of providing a short intermission, from 10 to 20 minutes, between features, during which intermission period the patrons were urged to patronize the concessions. It is during this intermission period that services such as those provided by plaintiff play a significant role in the industry.

The motion picture advertising business consists of three basic categories: (1) screen ads; (2) manufacturer-dealer programs; and (3) intermission films. Each are described below.

1. *Screen ads*—This category consists of a motion picture advertising company, such as the plaintiff contracting with the theatre owner for time on his screen and contracting with neighborhood businesses to pay for exhibition of their advertisements on the screen of the theatre.

2. *Manufacturer-dealer programs*—National manufacturers, such as Westinghouse, Ford, Chrysler, Honda Motor-

cycle, General Electric, etc. cause to be produced elaborate short films of their products. These films are then displayed at various theatres through arrangements made with the motion picture advertising company.

3. *Intermission films*—The intermission policy of the drive-in theatres and the large gross produced by their concessions taught that an intermission film would be helpful in promoting further concession sales and bringing in additional revenue from advertising. Basically, intermission films usually have a playing time of ten to twenty minutes as desired by the drive-in and the introduction is an announcement of the intermission, advising the patrons that the concessions are open, and announcing the remaining minutes of the intermission at intervals of one minute.

Having obtained a contract, oral or written with a drive-in theatre the intermission film company seeks advertisers to buy time on the screen. None of these advertisements contain live action nor animation. They consist of still photographs and the name and location of the advertiser's business and are displayed for about twenty seconds.

## II.

## PLAINTIFF'S EMPLOYMENT WITH THE DEFENDANT

The defendant was first employed by Theatre Time Clock, Inc., in 1953 following answer to an advertisement in the local newspapers for salesmen. At that time there was an oral agreement between the plaintiff and Stewart as to the compensation Stewart was to receive and what his duties would be in regard to the sale of advertising. Though there is no testimony in the record as to exactly what the nature of the training was that Stewart received when he was first employed by Theatre Time Clock, Inc. in 1953, there was testimony indicating that Theatre Time Clock, Inc. trains its salesmen by having the sales manager under whom the new salesman is to work accompany the new salesman for a period

of four weeks showing him how to sell advertising. This four week "training period" was later reduced to one week but exactly when is not shown in the record. Nevertheless, it is reasonable to assume that Stewart, the defendant herein, received some training consisting of an experienced employee accompanying him in calling on prospective customers for a short period of time at his initial employment.

Both parties operated pursuant to this oral agreement until September of 1964. At that time the president of the plaintiff corporation met with the defendant in New Orleans and discussed a proposed employment contract. In this contract the duties of the defendant are listed, his territory for selling screen advertising is defined and the remuneration he is to receive is spelled out including a bonus arrangement based on a percentage of the profits of Theatre Time Clock, Inc. Paragraph 13 of that contract provides "In the event that for any reason whatsoever Stewart ceases to act under this contract, he shall not, for a period of three years, and in an area described by circle with the radius of 150 miles with its center in New Orleans, Louisiana, engage in any activity or business selling screen advertising in any manner whatsoever whether as employee, shareholder, officer, director, partner, manager, owner, advisor, consultant or otherwise." Paragraph 14 of this same contract provides: "This contract shall be construed under the laws of the Commonwealth of Pennsylvania." After discussing the terms of the contract it was signed by the defendant and he retained one copy of the contract which contained only his own signature. The president of the plaintiff corporation testified that he returned to Pennsylvania with the original and other copies of the contract, and affixed his signature thereto on September 26, 1964. Apparently the defendant has never received a copy of the contract signed by any representative of the plaintiff corporation but only received and retained the copy of the contract bearing his own signature. However, it is undisputed

that both parties operated pursuant to the agreement and thus the instrument itself is only a written memorial of what the parties had previously agreed upon.

It is this contract which is the basis of the plaintiff's cause of action.

## III.

### CONFLICT OF LAWS ISSUE

With jurisdiction based on diversity, the law is settled that this court must apply the conflict of laws rule of the forum. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Co. v. Stenton Elec. Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus it is Louisiana law that must guide this court in considering the effect to be given that language of the contract which recites that the contract is to be construed under the laws of the Commonwealth of Pennsylvania. It should be noted that in the absence of the contract's reference to Pennsylvania law, a Louisiana court would apply Louisiana law since the contract was both entered into and contemplated that for the most part it would be performed in Louisiana.

Thus Pennsylvania law can only be applied by giving effect to the contract's reference to that law.

## IV.

### LOUISIANA'S POLICY REGARDING AGREEMENTS NOT TO COMPETE

Though parties to a contract are free to stipulate as they please, they may not stipulate contrary to public policy. This limitation is found in Louisiana Civil Code, Article 11, which provides that:

"Individuals cannot by their conventions derogate from the force of laws made for the preservation of public order or good morals.

But in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to public good."

Thus the question to be resolved is: Are agreements not to compete such as the one in the case at bar in violation of public policy of the state of Louisiana and therefore unenforceable in Louisiana, for if this be the case a stipulation of applicability of foreign law would contribute nothing to the enforceability of such an agreement. And if a Louisiana court would not enforce such a contract for public policy reasons, a Federal Court guided by Erie must also refrain from enforcing such a contract. May v. Mulligan, D.C., 36 F.Supp. 596, aff'd per curiam 6 Cir., 117 F.2d 259, cert. den. 312 U.S. 691, 61 S.Ct. 622, 85 L.Ed. 1127. See also 70 A.L.R.2d 1297 and cases cited therein.

Louisiana policy regarding agreements not to compete is clearly expressed in LSA–R.S. 23:921 as amended by Act 104 of 1962, which provides that:

"No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts or provisions thereof, containing any such agreement shall be null and enforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years."

In National Motor Club of Louisiana, Inc. v. Conque, 173 So.2d 238 (La.App.)

3rd Cir., 1965, cert. den. 247 La. 875, 175 So.2d 110. Louisiana's public policy as expressed in La.R.S. 23:921 was held to be a bar to enforcement of a similar agreement not to compete. The agreement in that case provided that:

"The Manager agrees that upon the termination of his services with the Company for any reason whatsoever, either by his own efforts or by Company's efforts, with or without just cause, not to engage in the business of owning, operating, establishing, maintaining, working in, financing, being a director, stockholder or consultant or in or by any other capacity or means engage in the business of operating a motor club or other similar type of touring service or operation in any way competitive to that of the Company for a period of five years from date of this agreement in the State of Louisiana."

In discussing earlier decisions dealing with this issue the court said:

" * * * their essential basis is the right of individual freedom and of individuals to better themselves in our free-enterprise society, where liberty of the individual is guaranteed. A strong public policy reason likewise for holding unenforceable an agreement exacted by an employer of an employee not to compete after the latter leaves his employment, is the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away his liberty to earn his livelihood in the field of his experience except by continuing in the employment of his present employer."

As shown above the agreement in the National Motor Club case is substantially similar to the agreement in the instant case.

This type of agreement is distinguishable from the agreement in Delta Finance Co. of Louisiana, Inc. v. Graves, 180 So. 2d 85 (La.App., 2d Cir. 1965) which provided in pertinent part that:

"It is agreed that in the event of the termination of this employment by either party, with or without cause, that for a period of three (3) years after such termination, if the Employee shall go into business alone or in conjunction with one or more others or in the employ of any person or legal entity, where the business of such employment shall be the same or similar to that of Company, except for another subsidiary of Century Acceptance Corporation:

(1) Employee shall not solicit any active or paid out customers of Company.

(2) Employee shall not loan to, pay off or pay on any active customer's accounts of Company.

(3) Employee shall not transmit or reveal any information, written or oral concerning the active or paid out accounts of Company, or method of operation or types of business forms of Company to a competitor or use same for himself or others in the same or similar employment.

(4) Employee shall not publish his photograph or cause it to be published, or allow it to be published, or use his name in advertising in conjunction with same or similar employment.

The court in Delta commented on this distinction as follows:

"The contract herein considered is distinguished from the contracts involved in National Motor Club of Louisiana, Inc. v. Conque and Aetna Finance Co. v. Adams, for in those cases the employees signed agreements *not to engage in a competing business.* The contract of which Graves complains does not prohibit his employment in a business competitive with the employer and thereby conflicts with LSA–R.S. 23:921, but only enjoins him not to solicit any active or paid out customers of Delta; not to loan to, pay off or pay on any active

customers' accounts of Delta; not to transmit or reveal information concerning the active accounts of, or method of operation or types of business forms of Delta to a competitor; and not to publish his photograph or allow it to be published in advertising in conjunction with similar employment. The effect of these provisions is to prohibit Graves from pirating or taking direct steps to secure and injure the business of the former employer, Delta. It does not prevent him from utilizing his training or competing with other similar businesses." 180 So.2d at 88.

█ Thus the agreement in the case at bar is of the type that is contrary to the public policy of Louisiana and can only be enforced if the conditions of the proviso added in the 1962 amendment to LSA–R.S. 23:921 with regard to training and advertising expenses are met.

In Aetna Finance Co. v. Adams, 170 So.2d 740 (La.App.) 1st Cir. 1964, cert. denied 247 La. 489, 172 So.2d 294, the court concluded that any training or advertising expenses would redeem the contract from the public policy condemnation.

However in National Motor Club of Louisiana v. Conque, supra, the 3rd circuit court of appeals of Louisiana held the training expense must be substantial and the advertising must not only advertise the business but the employee's relationship with the business.

The Supreme Court of Louisiana in denying application for certiorari in both cases on the grounds that the judgment was correct has provided little guidance to this court.

In Nalco Chemical Co. v. Hall, 237 F.Supp. 678 (E.D.La.1965) aff'd 5 Cir., 347 F.2d 90, Judge E. Gordon West of this Court considered the same statute before either the National Motor Club case or the Aetna Finance Co. case was decided. Judge West concluded as did the court in the National Motor Club case that the training expense must be substantial and the advertising something more than advertising the business itself.

█ This court concludes that it was not the intent of the Legislature of Louisiana in adopting the 1962 amendment to the statute to sanction agreements not to compete where only routine training and advertising are involved. In this regard the following language in the National Motor Club case is appropriate:

"Likewise, we do not think that normal expenses of administration and supervision can be used to justify these noncompetitive agreements, on the guise that such are 'training' expenses. If they are, then few if any employees could not be required to tie themselves down to their present employer by the exaction of noncompetitive agreements. What the legislators must have intended, it seems to us (since they do not repeal the basic prohibition against such contracts as void as against the public policy of this state), was to protect the investment of those employers who afford special training of a substantial nature to their employees, and to encourage them to do so." 173 So.2d at 241.

The conclusions of law in the Nalco Chemical Co. case also reflect sound reasoning:

3. * * * These exceptions are obviously designed to allow an employment contract to contain a limited provision not to compete if an employer has expended money for training an employee not usually or customarily expended in the normal type employment. In other words, it seems quite clear that the intent of this exception is to protect an employer, to a limited extent, in cases where the employer has furnished and paid for special training whereby the employee is by virtue of such expenditure by the employer, made a specialist in the employer's employ. The exception is not intended to cover the usual and customary expenses incurred in acquainting a new employee with his duties.

4. As to the exception contained in the statute pertaining to expenses of advertising, this Court also believes the intent is clear. It seems obvious that such expenses of advertising, in order to fall within the exception contained in the statute, must necessarily pertain in some way at least to the employee's connection with the employer's business. Where the expense of advertising is limited to the normal advertising of the employer's business and products, without any reference to the employee's connection therewith, it is difficult indeed to see how the exception to the statute could apply. If the Court were to hold that any expenses incurred in training an employee, and any expenses incurred in advertising the business, even though such advertising expenses had no reference to the employee's connection with the business, would bring the case within the exceptions contained in the statute, then the court would, in effect, be reading out of the statute all but the exceptions. This is necessarily true because it is almost impossible to conceive of a situation where a new employee is not, at first, an expense to the employer, and it is equally difficult to conceive of a business today that does not incur some expense in advertising. (237 F.Supp. at 681)

In the case at bar any training the defendant may have received took place in 1953, eleven years prior to the date of the agreement in question. Obviously then the training was in no way an inducement to enter the agreement. In addition the training that was provided was routine and thus did not meet the criteria mentioned above. Likewise the advertising consisted of advertising the business and not the relationship of the defendant to the business, and thus it too fails to satisfy the requirements set out above.

## V.

### CUSTOMER LISTS

Petitioner has also argued that because the defendant has made use of customer lists obtained from Theatre Time Clock, Inc., the injunction sought should be granted. The defendant testified that he was calling on a total of 130 to 140 customers at the time of the termination of his relationship with Theatre Time Clock, Inc. The record does not disclose how many of these customers were located within the area sought to be protected by the agreement not to compete, though the testimony does disclose that the defendant was making calls on customers well beyond the 150 mile radius mentioned in the agreement. The defendant further testified and it is not unreasonable to believe because of his years of experience in the business and the relatively small number of customers involved, that he knew who his customers were, their general wants and dislikes and approximately when their contracts with Theatre Time Clock, Inc. would expire. An employee is not required to ignore general information acquired by experience and committed to memory.

The decision in The Buckeye Garment Rental Co. v. Arthur Jones, Jr., Civil Action No. 67–1216 (E.D.La.1967) is not contrary to the holding in the instant case. The contract in the Buckeye case included a broad agreement not to compete similar to the agreement in the case at bar which the court found unenforceable and in addition a narrower agreement involving soliciting of former customers which the court did enforce relying on a severability clause in the contract. The enforceable more restricted agreement is not present in the instant case, and this court is not a liberty to reform the contract to make it one that might be enforceable.

The fact that the parties operated pursuant to this agreement for a period of time is of no moment because a contract against public policy cannot be made valid by ratification. (17 C.J.S. Contracts § 279, pg. 1209 and 12 Am. Jur. § 222, pg. 740).

For these reasons the contract in the case at bar is contrary to the public

policy of Louisiana, therefore unenforceable and the motion for a preliminary injunction must be and is hereby denied.

The plaintiff is however entitled to the return of any written customer information, inter-office memoranda or other material belonging to it and the defendant is hereby ordered to return any such information in his possession.