## W. R. GRACE & COMPANY

v.

## Claude J. SAVOIE, Arthur M. Hayes, and Gemini Industries, Inc.

### Civ. A. No. 70–529.

United States District Court,
E. D. Louisiana,
New Orleans Division.

May 4, 1970.

C. Dale Stout, Kullman, Lang, Keenan, Inman & Bee, New Orleans, La., for plaintiff.

Jerry C. Paradis, Baldwin, Haspel, Molony, Rainold & Meyer, New Orleans, La., for defendants.

BOYLE, District Judge:

Plaintiff, a Connecticut corporation engaged in the manufacture and marketing of coating, cleaning and antiseptic compounds for institutional, commercial and industrial use, filed its complaint to restrain the defendants, Hayes and Savoie, its former employees who are residents of Louisiana, and Gemini Industries, Inc., a Louisiana corpo-

ration[1] formed, owned and controlled by the individual defendants, from competing with it.

The plaintiff seeks an injunction enforcing the terms of a non-competitive provision in contracts of employment[2] formerly in effect between the plaintiff and the individual defendants, (1) prohibiting defendants Hayes, Savoie, and Gemini Industries, Inc., or any of its stockholders, officers, partners, agents, employees, representatives, or anyone acting in concert with them or on their behalf from directly or indirectly, either as a proprietor, partner, stockholder, employee, agent, or in any other capacity, engaging in the business of selling or promoting the sale of cleaning, coating, or antiseptic compounds for industrial, commercial, or institutional use in the territory or territories in which defendants Hayes and Savoie were working for plaintiff on January 31, 1970, until February 1, 1971, and (2) prohibiting defendants Hayes, Savoie, and Gemini Industries, Inc., or any of its stockholders, partners, agents, employees, representatives or anyone acting in concert with them, or on their behalf, from selling or soliciting orders for any such products to or from any persons, firm or corporation whom defendant Savorie and/or Hayes solicited or called upon while employed by plaintiff at any time during the six months preceding February 1, 1970, until February 1, 1971, and from using any information supplied to them by plaintiff or obtained by them while still employed by plaintiff for such purposes. Plaintiff further seeks damages in the amount of $160,000.00, attorney's fees, interest and costs, and for such relief as is appropriate.

The defendants contend that, under the facts of this case, enforcement of the non-competitive provisions of the contracts involved would violate Louisiana's public policy as contained in La. R.S. 23:921.[3] It is the defendants' position that the training and advertising shown by the plaintiff herein were not of the quality that would operate under the statute to make enforceable the generally unenforceable covenants not to compete.

A hearing was held on March 20, 23, and 24, 1970, and the matter was submitted for decision on the merits. The Court, having considered the evidence adduced at trial, the uncontroverted allegations of the verified pleadings, and the arguments of counsel, finds that there should be judgment for the defendants dismissing the complaint at plaintiff's costs, and in connection herewith files this opinion which shall serve as the Court's findings of fact and conclusions of law.

The claims of the plaintiff against each defendant will be considered separately.

1. *Arthur M. Hayes—Training*

In July, 1962, defendant Hayes was employed as a salesman by DuBois

1. The individual defendants submitted voluntary resignations to Grace on February 1, 1970, reserved their corporate name on January 25, 1970, and filed articles of incorporation on February 9, 1970.

2. Contract with defendant Hayes of August 18, 1964. Contract with defendant Savoie of March 9, 1966.

3. "No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years. As amended Acts 1962, No. 104, §§ 1, 2."

Chemical Company. Hayes had, at that time, no sales experience, but was hired because of his personality and extensive experience as a skilled aircraft and engine mechanic in the United States Air Force.

When he was hired, Hayes was furnished a briefcase and literature on the DuBois line of products and certain sales aids. To defray the company's expense, Hayes was required to make a deposit of $3.00 per month for twenty-two months, and in addition delivered to plaintiff his note for $57.00, in order to cover replacement costs and to encourage better care of materials.[4]

Before commencing his duties as a DuBois salesman, Hayes spent one weekend with Jack Pruitt, a DuBois District Manager, and Grant Hample of DuBois, during which time he installed dishwasher equipment at a restaurant.

When he began working for DuBois, he received a week of on-the-job training by Pruitt, making calls upon all the customers in the territory, demonstrating products on two occasions. At that time, Hayes sold to a meat packing plant, installing the product without any prior training or demonstration. The District Manager, for an eight month period, spent two days per month in the field with Hayes, instructing Hayes in the use of DuBois products, sales tactics, and avoidance of frequent errors.

In August, 1963, DuBois' Regional Manager, Lee Graham, spent the greater portion of a week in Springfield, Missouri, working with Hayes. The testimony indicates that the DuBois training consisted in large measure of supplying the trainee with technical data and explanatory brochures on the company's product line, introducing salesmen to company clients, servicing and building up old accounts and seeking new accounts.

In 1964, the plaintiff, W. R. Grace & Company, merged with DuBois Chemicals, DuBois becoming a division of Grace. In the ensuing reorganization, Hayes became District Manager in Little Rock, Arkansas. Following the merger and some two years after he became employed by DuBois, Hayes signed the employment contract, part of which is at issue in this action.[5]

4. Exhibit D-19 is a sales equipment receipt indicating the terms of use of sales equipment provided for new salesmen: Charges made against new salesmen: $66.00 to be deducted in weekly installments from drawing account checks. This represents cost of equipment as indicated below, which will remain the property of the salesman at any time that the portfolio binder contents (price pages, customer records and all other records and literature) are returned to DuBois Chemicals intact. The contents remain the property of DuBois Chemicals. DuBois Chemicals may elect to repossess all or any part of this equipment in which case the salesman consented to a deduction from the $66.00 deposit of an amount to cover wear and tear on the equipment, DuBois refunding the difference, if any, to the salesman. $20.00 charge against the salesman's commissions, representing the charge assessed for the use of the contents during tenure as a representative of DuBois Chemicals.

This, together with a note for $57.00, makes a total of $161.00 charged against salesman for equipment and contents. The note for $57.00 is collectible only in the event the contents are not returned at any time DuBois Chemicals asks for return of same. $66.00 breakdown: carrying case ($25), Ins. Folio ($4), Indust. Folio ($4), Transp. Folio ($4), Food Folio ($4), regular price book ($2), special Prods. book ($1.25), Kardex file book ($4.25), thermometer ($5), card file ($12.50).

5. "Agreement of Salesman not to Compete—
Salesman agrees that for a period of twelve months after termination of his employment with DuBois for any reason, he will not, directly or indirectly, either as a proprietor, partner, stockholder, employee, agent, or in any other capacity (a) engage in the business of selling or promoting the sale of cleaning, coating or antiseptic compounds for industrial, commercial, or institutional use in the territory in which the salesman

"Training" received by Hayes after the execution of this contract consisted chiefly of annual sales meeting and seminars designed to acquaint all its sales personnel in the field with the company's new products, and to spur them on to further sales efforts. In addition, an experienced District Manager, Mr. Frank Fourmy, spent two days introducing Hayes to his new duties as District Manager in Little Rock. In October, 1964, when Hayes was transferred to New Orleans as District Manager, Fourmy and Hayes flew to New Orleans together, where Fourmy spent three or four days with Hayes, introducing him to warehouse personnel and procedures, and certain difficulties the company was experiencing in the New Orleans area, to which Hayes would be required to give administrative attention. Fourmy also explained the potential market in offshore drilling operations. Fourmy returned to New Orleans in December, 1964, when he familiarized Hayes with metal and porcelain cleaning procedures.

The plaintiff's witness, Mr. Graham, testified that there was a 25% split of commissions on sales by Hayes to certain accounts that went to the company to help defray training expenses incurred by Grace in "training" its salesmen. To that extent Hayes made some contribution to the expense of his own "training."

Plaintiff relies on the theory that its products were of a highly technical nature, and its processes were very complex, requiring a high level of expertise on the part of its salesmen, which could be achieved only by continuous specialized training. The evidence shows, however, that a sophisticated knowledge of chemistry is not required of DuBois salesmen. The "technical data" sheets, on which the plaintiff premised this argument, contained no critical informa-

tion that was not printed on the reverse side of leaflet "brochures" for each product that were made available to, distributed to and used by the DuBois customers. The information contained in the technical data sheets and the brochures were substantially the same in both form and content.

The plaintiff also maintains that Hayes was trained to use very technical equipment. Exhibits D–13 through D–16 are representative equipment used in Mr. Hayes' work. This equipment, working on a simple siphon principle, is used generally in the cleaning industry, and certainly presented no challenge to Mr. Hayes, who was, prior to his employment by DuBois Chemicals, trained as a qualified aircraft and engine mechanic.

The initial "training" received by Hayes between 1962 and 1964 predated the execution of the employment contract between Grace and Hayes. Thus, the plaintiff cannot look to this training as consideration or justification for the non-competitive agreement with Grace signed by Hayes after two years' experience as a DuBois salesman and after having reached the position of District Manager.

The "training" subsequent to 1964 relied on by plaintiff is not the type of training envisioned in La.R.S. 23:921. Annual meetings and sales seminars are the normal, routine administrative meetings of a large sales organization, designed to introduce new products and stir the salesmen to further efforts on behalf of the organization. The television seminars relied on by the plaintiff were introduced long after Hayes had become a district manager for DuBois. Hayes testified that these seminars were of some value to new salesmen, but that experienced personnel already knew the material.

was working for DuBois at the time of termination of his employment or to customers located in such territory; or (b) sell or solicit orders for any such products to or from any person, firm or cor-

poration whom the salesman had solicited or called upon as a salesman of DuBois at any time during the six months preceding termination of the salesman's employment with DuBois."

This Court follows the reasoning expressed in Nalco Chemical Co. v. Hall.[6] In *Nalco*, the statutory exception was limited to cases where the employer has furnished and paid for special training whereby the employee is, by virtue of such expenditure by the employer, made a specialist in the employer's employ. The exception is not intended to cover the usual and customary expenses incurred in acquainting a new employee with his duties. A broader interpretation of the statute, such as is urged by the plaintiff herein, would extend the statutory exception to virtually all businesses, since it is necessary in most cases for a new salesman to receive some minimal training in the nature of his prospective duties.

The plaintiff has, therefore, failed to carry the burden of proving by a preponderance of the evidence that any expenses for training the defendant Hayes were incurred in this case that would not have been incurred by any and every employer who has employed a new employee.

### 2. *Claude J. Savoie—Training*

Grace and Company, DuBois Division, sought out and hired Savoie as a specialist for its expanding marine line. Savoie was, when hired, already an experienced soap and cleaning compound salesman, having worked for over two years for Turco Products, Inc., a Grace competitor. While employed by Turco, he received two and one-half months of intensive specialized training. After Savoie was employed, Mr. William Graves, Grace's National Marine Manager, spent a week with Savoie in New Orleans. In that period, they called aboard six or seven ships. One of the ships called on

had been, in fact, a former customer of Mr. Savoie when he worked for Turco. Part of the remainder of the week was spent in discussing prices, product names, and two pages of marine terminology. Graves testified that the products sold to the marine industry were basically the same products as in the DuBois general line, but that the nomenclature or terminology differed.

Savoie had had previous experience in the offshore oil industry and had been employed as a boat operator. In the course of this marine background, Savoie would certainly have become familiar with the majority of the terms found in the DuBois marine glossary.[7] Graves testified concerning the Butterworth machine, which he referred to as a machine used by a DuBois marine specialist, such as Savoie. This machine was one used and sold by Savoie during the course of his employment with Turco Products.

Plaintiff attempted to show a continuing course of training by means of introduction of a bulletin on "Harbor Oil Spills," which Graves testified was representative of the fifty technical bulletins he had written for the marine department. The defense introduced Exhibits D–6, D–7, D–8 and D–9, others of the technical bulletins, which reflect that these bulletins were of an administrative rather than a technical nature. Further, Graves admitted under cross-examination that the State of Louisiana did not permit the use of the product mentioned in the Harbor Oil Spill bulletin.

Exhibits D–3 and D–4 reflect that Mr. Graham, vice-president of the plaintiff corporation, recognized that Savoie had received very little training from Graves.[8] Both Graham and Graves ad-

---

6. 237 F.Supp. 678 (E.D.La.1965), affd. 347 F.2d 90 (5th Cir. 1965).

7. Exhibit P–21 is a glossary of marine terms furnished to Savoie. The terms are the following: sougee, house, turkshead, double bottoms, cargo deep tank, ballast, coastwise, storing, bunkering, bilge, first, second, boat-swain, butterworth, longshoreman, agent, lay up, char-

ter, dry dock, strip, boom, forward, aft, bow, hold, center tank, wing tank, sounding line, peak, vent line, manhole, gas free certificate, ullage, sludge, JF–5, HEAF, pyrate, overhead, bulkhead, skin, outboard, inboard, bo'sun locker, chandler, head, drag.

8. Exhibit D–3 is a letter from Graham to Jack Clawson, dated June 24, 1966.

mitted at trial that the 25% commission splits which were paid to Marine Engineering, a DuBois intracompany account, subsidized the expense of the Marine Department's "training" of marine specialists. The invoice in Exhibit D–20 shows that between $1500.00 and $2000.00 was taken from Savoie's commissions for this account.

■ In the case of Claude Savoie, the plaintiff has failed to establish that it expended, without reimbursement, a substantial sum for the training of the defendant, or that the defendant received that degree of specialized training required by La.R.S. 23:921.

### 3. *Advertising*

The plaintiff introduced Exhibits P–7, P–8, and P–9 as examples of its advertising. These exhibits indicate that the company's advertising consisted of product promotion, and did not include any advertisement of the DuBois salesmen, Savoie or Hayes. Hayes and Savoie also testified that the salesmen themselves expended their own money in promotion and advertisement of DuBois Chemicals. This advertisement included yellow-page advertisement in local areas, cigarette lighters, bars of soap, hand lotion, pencils and pens. All these items were purchased by the salesmen from DuBois and carried the DuBois name. The salesmen also paid for state and local exhibitions, and membership in the Louisiana Restaurant Association and Louisiana Dietetic Association.

The statute concerning non-competitive agreements is, by its terms, silent as to the extent and nature of advertising required to operate the exception to the general prohibition of such agreements. The jurisprudence of Louisiana reflects a clear split in authority on this question. In Aetna Finance Co. v. Adams,[9] the First Circuit Louisiana Court of Appeals held that general advertising expenses were sufficient for the statutory exception. The Third Circuit reached a contrary result in the *Conque*[10] case, and held that the expenses claimed to constitute training and advertising costs were simply the normal costs of administration and advertising incurred by any business, as distinguished from advertising the individual salesman. The Court found further that the meetings attended by Conque did not represent specialized training but rather were the normal administrative meetings held by sales organizations to spur their salesmen to greater sales efforts. The State Supreme Court has not indicated which view it accepts. The high court refused a writ of certiorari in *Aetna*, on the ground that on the facts found by the Court of Appeal there was no error of law.[11] Shortly thereafter, the State Supreme Court denied Conque's application for a writ of certiorari or review, holding that according to the facts of this case, the result reached by the Court of Appeals was correct.[12]

■ In the *Nalco* opinion which has been affirmed by the Fifth Circuit

"You mentioned that it cost the company money to have Bill Graves go to New Orleans to specifically train this new man. I don't know what you or Mr. Graves call training; but if sitting in a hotel room for the most part of a week and only making three actual calls on accounts training (sic) a new man, then your interpretation of training is different then (sic) mine. Mr. Savoie's success to this date is mainly due to the fact that J. L₁ Brown and I hired the right man, plus Mr. A. M. Hayes did one hell of a job training Mr. Savoie and working with him."

Exhibit D–4 is a letter from Graham to Clawson, dated August 8, 1966.
"Since Savoie has done such a fine job for the company in the Marine Industry with only a couple days (sic) of training from Bill Graves, I don't want to lose him."

9. 170 So.2d 740 (La.App. 1st Cir. 1964).

10. National Motor Club of La., Inc. v. Conque, 173 So.2d 238 (La.App. 3rd Cir. 1965).

11. 247 La. 489, 172 So.2d 294 (1965).

12. 247 La. 875, 175 So.2d 110 (1965).

Court of Appeals,[13] the Court found the advertising exception to be applicable only where there is, in the advertising itself, an explicit reference to the employee's connection with the business. The Court found that a contrary interpretation would, in effect, make the statute inoperative since nearly all businesses advertise. We agree with this statement of the law as reflective of the Louisiana public policy concerning covenants not to compete. This line of reasoning has been adopted in Theatre Time Clock, Inc. v. Stewart,[14] where the Court concluded that it was not the intent of the legislature of Louisiana in adopting the 1962 amendment to the statute to sanction agreements not to compete where only routine training and advertising are shown.

For the foregoing reasons, it is the opinion of this Court that there should be judgment for the defendants, dismissing the plaintiff's complaint at its cost.