Robert H. FINE

v.

**PROPERTY DAMAGE APPRAISERS, INC.**

Civ. A. No. 74–2460.

United States District Court,
E. D. Louisiana.

May 12, 1975.

Peter A. Feringa, Jr., Norris S. L. Williams, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for plaintiff Robert H. Fine.

Donald P. Schwarz, Matthew J. Hill, Jr., Ovide M. Tregle, Jr., Robert B. Chopin, Metairie, La., for defendant Property Damage Appraisers, Inc.

HEEBE, Chief Judge:

This is a diversity suit arising out of a dispute over the terms and conditions of a franchising contract. Plaintiff seeks a declaratory judgment, pursuant to 28 U.S.C. §§ 2201, 2202, determining the rights and liabilities of the parties, particularly with regard to the validity of an agreement not to compete contained in the contract. The case was tried to the Court, sitting without a jury, on March 19, 1975. After considering the testimony and exhibits introduced, the pleadings, and the written memoranda submitted by the parties, the Court enters its findings of fact and conclusions of law contained herein.

## I. FACTS

The facts are rather simple and not substantially in dispute. The defendant, Property Damage Appraisers, Inc. (P. D.A.), a Texas corporation doing business in Louisiana, grants franchises to individuals to engage in the business of furnishing automobile damage estimates to various insurance companies under the trademark of P.D.A. These individuals, upon receiving requests from insurance companies, investigate and estimate damage done to automobiles and report these estimates to the insurance companies. They are paid for their work by the insurers and forward weekly to the P.D.A. office in Texas a report listing the business done during the past week together with a percentage of the

fees they receive, 20% under the normal franchise agreement.

P.D.A.'s role in this operation is to assist new licensees in setting up their offices, to give them periodic supervision, and to induce insurance companies to use P.D.A. licensees for their appraisals by making personal contacts with the companies and by advertising the P.D.A. name nationally. With the exception of one home office in Texas, all of the acutual appraisal work is done by the individual franchisees or licensees in the various states.

In May 1969 the plaintiff learned that P.D.A. was looking for an appraiser to work in the New Orleans area and contacted Richard Gunn, then P.D.A.'s regional manager for the Southeast, who was in New Orleans. After some preliminary discussion, Fine signed a form franchise contract prepared by P.D.A. on May 22, 1969 at his home in New Orleans. The contract was then forwarded to the P.D.A. home office where it was signed on behalf of P.D.A. by its President. Under the terms of that agreement, Fine was granted an exclusive "license and franchise" to use the P.D.A. name for five years in the metropolitan New Orleans area, with the option to renew the contract for three consecutive 5-year terms.[1] Plaintiff was to pay P.D.

A. 20% of the charges collected for his work. Further, the contract provided that "on the termination for any cause whatsoever of this agreement," Fine would not engage in a similar line of business in the New Orleans area for three years following the date of termination. That provision was reinforced by a harsh liquidated damages clause, under which the licensee was to pay to P.D.A. ten times the total payments made to P.D.A. during the previous year if he breached the agreement not to compete.[2] Both Fine and Gunn testified at trial that this provision was specifically explained to Fine before he signed the contract. Although there was also some discussion about the option to renew, the Court finds there was no statement made as to the method by which Fine had to exercise his option.

Fine began his operation in June 1969, and Gunn flew to New Orleans for three days at that time to assist the plaintiff in setting up work. During that time, Gunn explained to Fine how records should be kept and canvassed insurance companies to inform them that P.D.A. was now doing business in their area. After this initial contact, Fine was visited approximately twice a year by Gunn or his replacement as regional manager for a period of two or three

1. "This contract is for a period of five (5) years from the date of execution hereof, and Licensor does further grant to Licensee the option to renew and extend this contract for three (3) consecutive 5-year terms, under the terms, conditions and provisions of this agreement."

2. The provision reads in full as follows:
"Licensee agrees that on the termination for any cause whatsoever of this agreement, he will not directly or indirectly engage in the same or similar line of business to that which he will carry on under this agreement, or engage to work for any individual or corporation engaged in such line or a similar line of business for a period of three (3) years from the time of the termination of this agreement in the same territory for which he is by this agreement granted an exclusive franchise by the Licensor. The Licensee hereby stipulates that he has carefully considered this noncompetition agreement

and that he feels that the territorial and time restrictions imposed are not unreasonable. It is, however, agreed by both parties hereto that if the territorial or time restrictions are found by a court of competent jurisdiction to be unreasonable they shall nevertheless remain enforceable over such area and for such length of time as the court shall determine to be reasonable.
"If the Licensee shall enter into the same or similar line of business within the territory and time period set forth above in violation of this non-competition agreement, then he shall pay to Licensor a sum of money equal to ten (10) times the total of the payments made to Licensor for the twelve (12) months immediately preceding the termination of this contract under the terms of Item 6. above, as liquidated damages for so doing, the sum being agreed to be the amount of damages which shall be done to the business of the Licensor by said act or acts."

days, during which time the manager's primary responsibility was to again canvass insurance companies.

The problem in this case arises because neither Fine nor P.D.A. made any explicit agreement concerning renewal of the franchise contract following the expiration of the 5-year period in late May 1974. Fine testified that he was scheduled to meet with P.D.A.'s new regional manager during that time and that he assumed a new contract would be discussed. The manager finally came to New Orleans in July 1974 to assist with the periodic canvassing of insurance companies for new business, but neither he nor the plaintiff entered into any discussion regarding the renewal of the contract.

Despite the lack of formal notice to P.D.A., either oral or written, that he would renew his contract, Fine continued to fully perform under the original contract during June and July 1974 by sending P.D.A. weekly reports together with the usual check for 20% of his fees from the insurance companies. He gave no indication during that time to any of P.D.A.'s representatives that these were anything other than payments under his written contract. With his report for the week ending August 9, 1974, however, Fine sent P.D.A. a check for only 10% of his fees together with a note to Gunn stating that "effective with this report I am reducing the royalty to 10%." Gunn called Fine immediately upon receiving the report and told him in no uncertain terms that that arrangement was unacceptable to P.D.A. and that he was obligated to continue paying fees at a 20% rate to P.D.A. Subsequently, plaintiff received a letter from Gunn stating that if the delinquent payments were not made, the franchise would be revoked, and he was told that he would not be allowed to work in New Orleans as an appraiser for three years under the agreement not to compete.

Plaintiff then corrected the deficiency under protest and thereafter sent P.D.A. the weekly 20% royalty in two checks, each for a sum equal to 10% of Fine's weekly fees with one of the checks containing the notation "under protest." P.D.A. cashed all of these checks, and Fine has continued to work for P.D.A. under this "protest" arrangement up to the date of trial.

Plaintiff seeks a judgment from this Court that a contract for payment of 10% royalties is in effect and that he is entitled to $3,447.33, which represents the amount paid by him to P.D.A. under protest, as of March 8, 1975. Further, he seeks a declaratory judgment as to the validity of the agreement not to compete.

## II. AMOUNT IN CONTROVERSY

■■ On the morning of trial, the defendant moved to dismiss the complaint claiming the amount in controversy did not exceed $10,000. 28 U.S.C. § 1332. We must rule on the issue, despite the fact that the defendant admitted in both his answer and the pre-trial order that the proper jurisdictional amount existed, since lack of subject matter jurisdiction may be raised at any time. *See generally* 1 J. Moore, Federal Practice ¶ 0.60[4], (2d ed. 1974). We find the claim without merit.

While plaintiff seeks a return of only some $3,400, the amount at issue is substantially higher. The difference between the 10% and 20% royalty fees claimed by the parties amounts conservatively to $4,000 per year, or at least $20,000 over a 5-year contract. Further, the liquidated damages provision of the contract, if imposed upon the plaintiff for breaching the agreement not to compete, which agreement is properly at issue here, see Part V, *infra*, would alone result in the payment by plaintiff of more than $80,000. Without belaboring the point, the Court is satisfied that the amount in controversy well exceeds the jurisdictional minimum.

## III. CONFLICT OF LAWS

■■ Guided by the well-established principles of *Erie* and *Klaxon*, a federal

diversity court must apply the conflict of laws rule of the forum state in determining which state's laws apply. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The contract signed by Fine contains a form provision that the contract shall be interpreted under the laws of the State of Texas. Thus, whether this stipulation shall be given effect depends upon Louisiana conflict of laws principles.

The basis of the Louisiana law is found in the Louisiana Civil Code, Article 11:

> "Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals.
>
> "But in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to the public good."

Thus, where the parties have stipulated upon the state law governing the contract, Louisiana conflict of laws principles require that the stipulation be given effect, unless to do so would violate strong public policy considerations in Louisiana. Davis v. Humble Oil & Refining Co., 283 So.2d 783, 794 (La.Ct. App.1973) (on rehearing). Restatement (Second) of Conflicts, § 187 (1971); H. Goodrich & E. Scoles, Conflict of Laws at 203 (4th ed. 1964). *See generally* Ehrenzweig, Adhesion Contracts in the Conflict of Laws, 53 Colum.L.Rev. 1072 (1953). In its original opinion, the *Davis* court held that where a Louisiana resident sought disability benefits under a Humble Oil pension plan that provided that it would be governed by the laws of New York, the provision was not controlling since (1) the provision was part of an adhesion contract and (2) the litigation bore no significant relationship to the State of New York. On rehear-

ing, the court reversed itself and held that the New York law was controlling, reasoning that where employees were scattered throughout various states, it was important that the pension plan be construed uniformly for all employees. The fact that the provision was part of an "adhesion contract" did not render it unenforceable.

The same general policy applies here. P.D.A. licenses individuals in many states throughout the country. Insofar as possible, the contract regulating their employment should be construed uniformly, according to the stipulated Texas law, the state in which P.D.A. is incorporated. Thus, in considering whether Fine exercised his option to renew his contract, we shall apply the laws of the State of Texas.

The validity of the agreement not to compete is an entirely different matter. For reasons stated in Part V, *infra*, we conclude that Louisiana has expressed strong public policy reasons against enforcement of agreements not to compete, with limited exceptions not applicable to this contract. Since the application of Texas law would result in at least partial enforcement of that agreement, Fidelity Union Life Ins. Co. v. Protective Life Ins. Co., 356 F.Supp. 1199 (N. D.Tex.1972), *aff'd*, 477 F.2d 594 (5th Cir. 1973), Texas law can not govern this aspect of the contract. Theatre Time Clock, Inc. v. Stewart, 276 F.Supp. 593 (E.D.La.1967). We thus apply the substantive law of Louisiana, which would be the applicable law in the absence of an effective choice of law by the parties.

## IV. THE OPTION TO RENEW

█ Plaintiff places primary reliance on the actions which took place in early August 1974 when he first proposed to pay P.D.A. only 10% royalties on his fees. The more relevant actions, however, are those occurring in late May 1974 when the original 5-year term

expired,[3] and Fine could exercise an option to renew for an additional 5-year term.[4]

The law of Texas provides, in accordance with the general rule, that acceptance of an offer may be shown by performance and the acceptance of benefits by the person to whom the offer is made. United Concrete Pipe Corp. v. Spin Line Co., 430 S.W.2d 360 (Tex. 1968); McCarty v. Langdeau, 337 S.W. 2d 407 (Tex.Civ.App.1960). As Professor Corbin has stated, "if the offeror specifies no mode of acceptance, the law requires no more than that the mode adopted shall be in accord with the usage and custom of men in similar cases." Corbin on Contracts, § 67, p. 276 (1963). See Williston on Contracts, § 90 (1957). Fujimoto v. Rio Grande Pickle Co., 414 F.2d 648 (5th Cir. 1969); Aetna Casualty & Surety Co. v. Berry, 350 F.2d 49, 54 (5th Cir. 1965).

The option provision does not specify the means by which plaintiff may exercise his option. It does not require that the plaintiff give any advance notice to P.D.A., either oral or written, before the additional 5-year term becomes effective. The Court finds that by continuing to work for P.D.A. in the same manner as he had previously done and by continuing to pay P.D.A. a weekly 20% royalty fee as provided in the contract for more than two months following the termination of the initial term, Fine had effectively exercised his option to renew.

Fine's testimony at trial that he was waiting to negotiate a new written agreement is a little difficult to understand. First, his option to renew was only under "the terms, conditions and provisions of this agreement." He knew that the 20% royalty figure was a standard form provision, and he could not reasonably expect to negotiate a different amount. Second, he gave no indication to P.D.A. prior to August 1974 that he was dissatisfied with the present financial arrangement or that his work in June and July was only interim in nature. When P.D.A. gave plaintiff an unconditional option to renew his contract without any further negotiation with them, and he proceeded to perform under that contract, he could reasonably anticipate that P.D.A. would infer that he had exercised his option to renew.

Plaintiff would have the Court declare that a new contract for payment of 10% royalty fees has been in effect since June 1, 1974. This contention exposes the inherent untenability of his claims. Even accepting *arguendo* plaintiff's premise that a new 10% royalty contract was entered into, it did not take effect until August 1974. But plaintiff apparently recognizes that he must attach some legal significance to his continued employment in June and July of that year and would give his alleged August contract two months' retroactive effect. The more tenable position is to hold, as we do, that the option to renew was exercised in June.

The only legal consequences thus flowing from Fine's withholding of 10% fees in August 1974 would be breach of contract. However, since the full 20% royalty fees have now been paid, plaintiff is not in breach of his obligations, and the contract continues in effect.

## V. THE AGREEMENT NOT TO COMPETE

▆ Since there is no breach of contract, the validity of the agreement not to compete is technically not at issue. However, where a real, substantial, and existing controversy between parties

---

3. There is a minor question as to the exact date of termination of the 5-year term. While both parties agree that the initial term expired on May 30, 1974, five years after the date stated in the contract for the agreement to take effect, the contract is rather inartfully drawn in this regard. Paragraph 1 of the contract states that the contract is for a period of five years from the date of execution, which was May 22, 1969. This discrepancy has no effect on the underlying controversy before the Court, and we need not resolve it.

4. See note 1, *supra*.

to a contract exists, a party may not be compelled to breach the contract in order to determine the legal consequence of that breach, and a declaratory judgment is a proper vehicle for relief. Keener Oil & Gas Co. v. Consolidated Gas Utilities Corp., 190 F.2d 985, 989 (10th Cir. 1951). *See* Maryland Casualty Co. v. Pacific Co., 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941). The use of declaratory judgment is particularly compelling where the validity of an anti-competitive clause is questioned because otherwise plaintiff is left to test it only by his breach of contract, subjecting himself to the risk that the clause be held enforceable and that he suffer the severe consequence of being enjoined from working in a similar line of business for a matter of years.

The validity of agreements not to compete is governed by L.S.A.–R.S. 23:921:

> "No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, *provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisment of the business that the employer is engaged in,* then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment

that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years." (emphasis added)

Prior to 1962, the statute contained no exceptions and thus served as a strict prohibition against any anti-competitive agreements. It was based on Louisiana's strong public policy against "the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away his liberty to earn his livelihood except by continuing in the employment of his present employer." National Motor Club of La., Inc. v. Conque, 173 So. 2d 238, 241 (La.Ct.App.), *writ ref'd,* 175 So.2d 110 (La.1965), *cited in* Orkin Exterminating Co. v. Foti, 302 So.2d 593, 596 (La.1974).

In 1962, the statute was amended to add a limited exception to this prohibition for cases in which expenses are incurred in training the employee or in advertising. After several years of conflicting lower court decisions over the scope of these exceptions,[5] the Louisiana Supreme Court has recently reaffirmed Louisiana's strong policy against noncompetition agreements and construed the exceptions very strictly. Orkin Exterminating Co. v. Foti, *supra.* The court held that for the exception to apply either (1) the expenses incurred in training the employee must be substantial, excluding normal expenses of administration and supervision, such as the time spent breaking in a new employee or (2) the advertising must relate not to the employer's business generally but to advertising the particular employee, and the expenses must be sub-

5. *Compare* Weight Watchers of La. v. Ryals, 289 So.2d 531 (La.Ct.App.1973), aff'd, 302 So.2d 598 (La.1974) *and* National Motor Club of La., Inc. v. Conque, *supra, with* National School Studios, Inc. v. Barrios, 236 So.2d 309 (La.Ct.App.1970) *and* Aetna Finance Co. v. Adams, 170 So.2d 740 (La.Ct. App.1964), writ ref'd, 247 La. 489, 172 So.2d 294 (La.1965). *See also* W. R. Grace & Co. v. Savoie, 322 F.Supp. 790 (E.D.La.1970), aff'd, 438 F.2d 532 (5th Cir. 1971) ; Theatre Time Clock, Inc. v. Stewart, *supra*; Nalco Chemical Co. v. Hall, 237 F.Supp. 678 (E. D.La.), aff'd, 347 F.2d 90 (5th Cir. 1965).

stantial. Further, the expenses incurred in training or advertising must be substantial not only in an absolute sense, but also in relation to the period of the employee's service. Orkin Exterminating Co. v. Foti, *supra*, at 598 n. 3; Gulf Toy House, Inc. v. Bertrand, 306 So.2d 361, 365 (La.Ct.App.1975).

The expenses spent by P.D.A. fall far short of meeting either prong of this test. First, the only training which P.D.A. gave Fine was showing him the proper record-keeping procedures of P.D.A., which are expenses of normal supervision and administration only. Fine was an experienced appraiser prior to his coming to P.D.A., and Gunn testified at trial that he was only interested in hiring experienced employees whom he wouldn't have to train in techniques of appraisal.

Second, the advertising of plaintiff's connection with P.D.A. consisted of two single sheets containing Fine's picture and qualifications which were sent to insurance companies announcing the opening of the New Orleans office, and a small brochure with Fine's name on it listing the automobile dealers and body shops in New Orleans. While P.D.A. did not introduce any evidence as to the cost of this advertising, it certainly is not substantial, especially in relation to Fine's more than five years of employment with the company.

P.D.A. suggests, without citing any authority, that because this is a franchise or license agreement and not a strict employment contract, the restrictions of L.S.A.–R.S. 23:921 do not apply. However, the form of the contract relationship is not determinative, at least so long as the "disparity in bargaining power," National Motor Club of La., Inc. v. Conque, *supra*, at 241, still exists. *Compare* McCray v. Cole, 236 So.2d 863 (La.Ct.App.1970) *rev'd on other grounds*, 259 La. 646, 251 So.2d 161 (1971) *with* McCray v. Blackburn, 236 So.2d 859 (La.Ct.App.) *writ ref'd*, 256 La. 845, 239 So.2d 355 (1970). In National School Studios, Inc. v. Barrios, *su-*

*pra,* the Louisiana Court of Appeals enjoined an independent contractor from competing pursuant to a non-competitive agreement. The Louisiana Supreme Court in Orkin Exterminating Co. v. Foti, *supra,* overruled *Barrios*, thus holding by implication that L.S.A.–R.S. 23:921's prescription applies in favor of independent contractors as well as employees.

Finally, since the agreement not to compete is invalid, the provision for liquidated damages in the event of violation of that agreement must also fall. McCray v. Cole, 259 La. 646, 251 So.2d 161 (1971).

In summary, we find that (1) plaintiff exercised his option to renew his franchise agreement in late May 1974, and a 5-year contract obligating the plaintiff to pay the defendant 20% royalty fees is now in effect and (2) the provision in the franchise agreement not to compete is unenforceable under Louisiana law.

A judgment will be entered accordingly.